IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BODYGUARD PRODUCTIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 17-cv-7667 |
| v. | ) | |
| | ) | Judge Robert M. Dow |
| DOES 1-25 (including | ) | |
| DOE NO. 23, ERNESTO MENDOZA), | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S CORRECTED RESPONSE TO DEFENDANT'S MOTION FOR RECONSIDERATION**

Plaintiff, Bodyguard Productions, Inc., hereby responds to Defendant's Motion for Reconsideration, as follows:

**I. INTRODUCTION**

On February 19, 2019, this Court granted Plaintiff's Motion to Dismiss against Defendant Mendoza (Doe No. 23) and ordered each side to bear its own fees and costs. [Dkt. No. 51]. On March 19, 2019, Defendant Mendoza filed a Motion for Reconsideration of this Court's Order of February 19, 2019. [Dkt. No. 54]. This Court's Order of February 19, 2019 is proper and correct at least because: (1) the Court has discretion in awarding attorney fees; (2) Defendant's reliance upon the 9th Circuit opinion in *Gonzales* has no binding effect on the present matter; and (3) Defendant's reliance upon the observations of co-counsel, David Madden, is misguided because his layman's understanding of how Plaintiff's infringement detection system operates is flawed. As such, this Court's ruling of February 19, 2019 should stand.

## II. ARGUMENT

In general, motions for reconsideration are "viewed with disfavor," and are granted "only in the rarest of circumstances and where there is a compelling reason." *HCP of Ill., Inc. v. Farbman Grp. I, Inc.*, 991 F. Supp. 2d 999, 1000 (N.D. Ill. 2013). *United States v. Givens*, No. 12 CR 421-1, 2016 WL 6892868, at *2 (N.D. Ill. Nov. 23, 2016). A party seeking reconsideration "bears a heavy burden," *Patrick v. City of Chicago*, 103 F. Supp. 3d 907 (ND Ill. 2015), and the decision whether to grant a motion to reconsider "is a matter squarely within the Court's discretion." *Darvosh v. Lewis*, No. 13 C 4727, 2015 WL 5445411, at *3 (N.D. Ill. Sept. 11, 2015) (citing *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996)). A party seeking reconsideration has "a high mountain to climb when arguing that a motion to reconsider [ ] should be granted." *Cruz-Moyaho v. Holder*, 703 F.3d 991, 998 (7th Cir. 2012). "The Seventh Circuit has long cautioned that appropriate issues for reconsideration "rarely arise and the motion to reconsider should be equally rare." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990). This is because the Court's order "is not a brief that is subject to refutation and it is inappropriate for the Defendants to file a motion for reconsideration merely because they disagree with the Court." *In re Abbott Depakote Shareholder Derivative Litigation,* 2013 WL 4953686 at pg. 4.

Motions for reconsideration serve a very limited function: to correct manifest errors of law or fact or to present newly discovered evidence. *See Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000). A manifest error is not simply a mistake or the kind of error that can result in a reversal on appeal, but rather a "wholesale disregard, misapplication, or failure to recognize controlling precedent." *Id*. (quoting *Sedrak v. Callahan*, 987 F. Supp. 1063, 1069 (N.D. Ill. 1997)). The moving party must show that the Court "has patently misunderstood a

party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee, 906 F.2d at 1191.*

      A.      This Court's Decision of February 19, 2019 was Not a Manifest Error

Defendant erroneously claims this Court made an error in application of the law regarding the February 19, 2019 Order [Dkt. No. 51] because "…the Court did not properly apply Seventh Circuit precedent regarding prevailing party fee awards under §505 of the Copyright Act." (Defendant's Motion for Reconsideration, pg. 3). Defendant's understanding of precedent regarding fee awards is incorrect.

"The United States Supreme Court has admonished that fees should not be awarded as a matter of course, but in light of various equitable factors, keeping in mind the purpose of the Copyright Act and treating prevailing plaintiffs and prevailing defendants alike. *FASA Corp. v. Playmates Toys, Inc.,* 1 F.Supp.2d 859, 862 (N.D. Ill. 1998). "However, the Seventh Circuit has held that attorneys' fees are not to be awarded in every case." Id. at 864. "The Copyright Act … allows the award of attorney's fees to the prevailing party in the discretion of the court." *Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931, 942 (7th Cir. 1989). "The Supreme Court [in *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994)] did not precisely articulate what should guide a district judge's exercise of that discretion. It did, however, cite *Lieb v. Topstone Industries, Inc.,* 788 F.2d 151, 156 (3rd Cir. 1986), with approval in a footnote, for a nonexclusive list of factors which could be considered. They include "frivolousness, motivation, objective unreasonableness (both in factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Harris Custom Builders, Inc. v. Hoffmeyer,* 140 F.3d 728, 730 (7th Cir. 1998).

3

Therefore, whether or not to award attorney's fees is left to the discretion of the court. The present case involves a copyright infringement claim which is neither frivolous nor objectively unreasonable, as further shown by the accompanying Bunting Declaration. Notably, counsel for Defendant was only involved in the case for about two-and-a-half weeks before Plaintiff moved to dismiss Defendant.

Lastly, the cases cited by Defendant are not analogous to the present case. Defendant first cites *Riviera Distributors, Inc. v. Jones,* 517 F.3d 926 (7th Cir. 2008). In *Rivera Distributors,* plaintiff's case had been pending for more than a year and plaintiff conceded it lacked evidence to prove its claim. Moreover, the parties had previously settled a similar case and, pursuant the terms of that settlement, agreed to resolve any issues between the parties by an independent software expert; but plaintiff refused to abide by those terms.

Defendant also cites *Assessment Technologies of WI, LLC v. WIREdata, Inc.,* 361 F.3d 434 (7th Cir. 2004) in which the defendant attempted to obtain compiled data regarding specific properties including -- address, owner's name, age of the property, number of rooms and assessed valuation for use by real estate brokers in southeastern Wisconsin. According to Wisconsin's 'open records' law, the underlying information is available to anyone willing to pay the cost of copying the data onto a disk. Plaintiff brought suit for copyright infringement to block defendant's access to that compiled data even though plaintiff did not create nor obtain the data which itself was not copyrighted nor copyrightable.

Lastly, Defendant cites *Klinger v. Conan Doyle Estate, Ltd.,* 761 F.3d 789 (7th Cir. 2014). In *Klinger,* the estate of Sir Arthur Conan Doyle sued authors and entities using the characters in the Sherlock Holmes stories despite the fact that the copyright on those characters had expired. The estate's business strategy was to demand a modest license fee to which it was

4

not entitled in the hope that the writer/publisher would pay the fee rather than incur substantial legal fees to challenge the legality of the demand.

As noted above, the authority cited by Defendant has no bearing on the present case, where Plaintiff had a valid claim for copyright infringement, but decided to discontinue litigation upon being informed of the health of Defendant.

    B.    <u>Newly Discovered Evidence</u>

Defendant claims that this Court should reconsider its ruling of February 19, 2019 in view of "newly discovered evidence" comprising recent deposition testimony of Benjamin Perino in another case in Oregon. Defendant raises several inaccurate claims regarding Plaintiff's abilities to detect infringing individuals through its detection system. Defendant supports his claims by including a declaration from co-counsel, David Madden, who is not an expert in computer technology and even states that "[he] [does] not claim to be an expert in computer networks, BitTorrent transactions, or legal evidentiary principles…", Rather, Mr. Madden states that he recently conducted the deposition of Mr. Perino, a computer system expert. (Decl. David Madden, ¶6, pg. 2). In his declaration, Mr. Madden erroneously claims, among other things, that Plaintiff discards exculpatory information. It does not.

Plaintiff, on the other hand, provides the declaration of Stephen M. Bunting, a certified independent digital forensics examiner with over 20 years of experience as a nationally recognized expert in computer and infringement detection software, who developed and conducted tests on the infringement detection software used by Plaintiff to determine the software's accuracy and integrity. Among other assignments, Mr. Bunting has worked over the past 20 years as a consultant, instructor and expert witness in numerous computer-related matters

and over the past ten years as a senior instructor supporting the U.S. Department of State Anti-Terrorism Assistance Program's Cyber Division.

Mr. Bunting's curriculum vitae is attached as Exhibit A to his accompanying declaration of May 14, 2019 listing his background as an experienced digital forensics examiner including, among other things:

> the acquisition and forensic examination of digital and video media using industry standard forensics tools;

> investigative consultation and digital forensics examinations in many areas including spoliation, theft of intellectual property, malware analysis, unlawful access of computer systems, theft of corporate resources, employee misuse of computer systems, Medicaid fraud and support of various types of criminal investigations;

> consulting and developing E-Discovery plans including electronic discovery processing from initial acquisition to final load file;

> conducting hundreds of examinations of computer systems for federal, state and local law enforcement and prosecutional agencies; and

> testifying in many trials as a computer forensics expert.

As explained in detail in the accompanying Declaration of Stephen Bunting, the infringement detection software system used in the present case: (1) Is accurate in detecting an infringing party's IP address, identifying metadata (client software and the version used by the infringer) and identifying known test files distributed on a torrent network; and (2) Is much better with greater integrity features than similar software used by law enforcement in peer-to-peer investigations.

Moreover, as an expert in computer systems who had an opportunity to examine and review the MaverickEye Detection System, (the "Detection System" or "MaverickEye infringement detection software") Mr. Bunting has concluded that the files downloaded via the BitTorrent peer-to-peer network were identical, bit-for-bit copies of the original test source

copies. (Report of Stephen bunting, ¶36, pg. 23). Furthermore, all files downloaded from the BitTorrent network contain the actual data or the shared file and the IP address of the computer sharing the data. (*Id*. ¶37, pg. 23-24). The Detection System does not capture every file being shared on the BitTorrent network, but only those files it is configured to monitor. Of those files the Detection System is configured to monitor, it accurately identifies the IP address of the device sharing the file as well as the exact time the file was shared. (*Id*. ¶37, pg. 24). The Detection System accurately identifies each and every packet and contains the IP address of the sender and receiver for every packet involved in the transaction, not just those containing the data. (*Id*. ¶40, pg. 25).

Plaintiff uses the Detection System to monitor BitTorrent networks for copyright infringement of Plaintiff's movies through the use of proprietary forensic software developed by GuardaLey as part of an infringement detection system to scan peer-to-peer networks for the presence of infringing transactions, extract relevant data from those transactions and generate reports evidencing those transactions. To better understand how information travels over the network,

> "Information sent over a network travels in packets. Each packet contains, among other data, a destination IP address, a destination port, a source IP address, and a source port. Thus, every packet contains what amounts to a delivery address and a return address, to make this somewhat analogous to the postal system by which mail travels. A stream of packets constituting a bit torrent download will often contain thousands of packets, each and every one of them containing source and destination IP addresses. As those packets also contain the file data of the bit torrent file, the source IP address for packets containing the file data itself is demonstrable evidence of the source of the file captured by the MEU system. A bit torrent network shares files on a peer-to-peer basis, meaning the two computers actually connect to each other. Hence the destination and source IP's represent the two computers involved in this file sharing. Further, these packets travel via a TCP protocol, which is a guaranteed delivery system. If a packet sent is not acknowledged as received, it is sent again and again, until it either is acknowledged or times out and fails." (Decl. Stephen Bunting, ¶29, pg. 19).

In the present case, the Detection System successfully identified individuals using the Bit Torrent network, which is a peer-to-peer file sharing network where files or portions of files are shared by direct connections between computers. (Report of Stephen Bunting, ¶40, pg. 25). When an individual wants to download a particular file, they search for the file through multiple websites using the BitTorrrent network. (*Id.* ¶19, pg. 31). The BitTorrent network has servers that are called "trackers", which keep track of the files available for downloading among its users. *Id.* The BitTorrent system splits the files into 16 kilobyte packets, so that each piece can be sent separately regardless of its position in the file. (*Id.* ¶ 46, pg. 29). Each file contains a hash, which is similar to an electronic fingerprint, the file and the trackers for the file. (*Id.* ¶21, pg. 15, ¶19, 32). When a direct connection occurs, packets containing the file segments are exchanged, and the destination and source IP addresses of the connected computers are exchanged. (*Id.* ¶29, pg. 18). The BitTorrent network employs a tit-for-tat feature, wherein, if a user wishes to download a file, they must share files as well. (*Id.* ¶19, pg. 31).

The Detection System uses modified BitTorrent software that does not download or share files, but instead monitors the network for certain files being shared. (*Id.* ¶19, pg. 31). Once the Detection System identifies a particular file, the Detection System joins the swarm, or those actively sharing the file, and downloads from those sharing files. (*Id.* ¶19, pg. 32). The Detection System then connects to other users and records the name of the file, the user's IP address and the time that the sharing occurred. (*Id.* ¶19, pg. 33).

> "A public or internet routable IP address is a router or computer's address on the internet at a specific time. IP addresses uniquely identify a computer, as no two computers can have the same exact public, internet routable, IP address at the same time. If the address is that of a router, the computer typically has a private address behind the router. In a typical home network, the ISP provides a 'box', which is often a modem and a router / firewall / DHCP server. The router has a public or internet facing IP address assigned to it. On the back side of the router, several devices (computers, smartphones, etc.) are connected using private addresses…Other computers on the internet, including peer-to-

>peer software, see and use the public facing IP address assigned to the customer's router. The router routes network traffic for specific devices on the private side or behind the router using a protocol called NAT (Network Address Translation), thus assuring network traffic is sent to the correct computer." (*Id.*, ¶11, pg. 11).

The infringing IP addresses are then analyzed using an IP geolocation database by which the offending IP addresses are isolated and filtered to those within this Court's jurisdiction. (*Id.* ¶11, pg. 12).

Mr. Bunting determined that the Detection System accurately identified an infringing party's IP address, the version of the infringer's software and was able to identify the test files distributed over the BitTorrent network. (Decl. Stephen Bunting, ¶20, pgs. 20-21). Mr. Bunting also determined that MaverickEye's infringement detection software is superior to the systems used by law enforcement because it has greater integrity features, captures and retains network packets, uses a WORM drive to store evidence, is housed to run an ISO/IEC 270001:2013 compliant datacenter and is PCI security compliant. (*Id.*, ¶19, pg. 14).

Mr. Bunting tested the veracity of the MaverickEye infringement detection software, the file integrity and for claims of hash value collisions. To test the MaverickEye software, Mr. Bunting created four (4) videos embedded them with metadata and hashes, which are algorithms that produce a unique value, similar to an electronic fingerprint. (*Id.*, ¶21, pg. 15). Then, using four (4) separate computers, each having a different operating system and BitTorrent software, he installed Wireshark to record the traffic over the network. (*Id.*, ¶¶22, 23, pgs. 15-16). On a fifth computer, designated the source machine, Mr. Bunting placed torrent files and allowed them to 'seed,' or become available for others to download over the BitTorrent network. (*Id.*, ¶24, pg. 16). Soon thereafter, each torrent file was able to locate and download the test files which were identical to the original test files and included the embedded data and hashes. (*Id.*, ¶24, pg. 16). The Detection System was able to identify, capture and retain the network packets

involved in the file sharing process, as they existed nowhere else, contained the actual data (shared file content), had the same hashes and metadata and the public facing, internet-routable IP address of the computer sharing that data, proving they were bit-for-bit identical copies. (*Id.*, ¶¶24, 37, pgs. 16 & 23).

For the next part of the test, Mr. Bunting stopped the source computer, which made the four (4) test computers the only sources of the test files. (*Id.*, ¶25, pg. 17). Then, he provided the four (4) torrent files to the Detection System administrator, in order to determine whether the Detection System could locate the test files on the torrent network, download them and identify the IP addresses of the device responsible for distributing the files. *Id.* For the first phase of this test, two (2) of the four (4) test computers were behind a firewall/router and would share the same IP address and could only be distinguished by their port number and BitTorrent software version. (*Id.*, ¶26, pg. 17). Once the Detection System had been loaded with the BitTorrent files, Mr. Bunting took the third test computer to another location and connected it to a different IP address. (*Id.*, ¶27, pg. 17). Shortly after an hour, the Detection System administrator informed Mr. Bunting that the Detection System had identified all three (3) files placed in the BitTorrent network. *Id*.

In the next phase of testing, Mr. Bunting shutdown the third test computer and returned to the location of the two (2) test computers running the BitTorrent software. (*Id.*, ¶27, pgs. 17-18). Mr. Bunting then connected the fourth test computer to the public address shared by the other test computers. (*Id.*, ¶28, pg. 18). Shortly afterwards, he was notified that all four (4) files had been detected by the Detection System software and the test was concluded. *Id*.

Mr. Bunting was provided with a copy of the PCAP files, a spreadsheet summarizing the captures and copies of the four (4) test files that the Detection System downloaded based upon

the torrent files that were sent to him. (*Id.*, ¶29, pg. 18). For all four (4) test files, the MaverickEye infringement detection software captured the IP addresses for the source of the test files being shared with the BitTorrent network which Mr. Bunting then compared against the IP addresses that were recorded prior to the downloads. (*Id.*, ¶30, pg. 19). The Detection System correctly captured the exact name of the BitTorrent client and software version used by each test computer through the exchange protocol that occurs when the test computer connects to the computer hosting the file to be shared on the BitTorrent network. (*Id.*, ¶31, pg. 19).

      Mr. Bunting was able to positively confirm that the MaverickEye infringement detection software accurately reported the source of the IP addresses and other metadata captured by the system were accurate by spot checking several packet captures, which are the packets sent and received from a test machine. (*Id.*, ¶32, pg. 20). While making the data packet comparisons, Mr. Bunting examined the TCP (Transmission Control Protocol) layer of packets, to verify that the port numbers are being correctly reported. *Id*. In this case, the Detection System requested a segment of the file being shared by the machine and was able to verify the file by index number. (*Id.*, ¶32, pg. 21). The Detection System stores and produces PCAP event reports, which summarize the captured network packet data. (*Id.*, ¶33, pg. 22). For testing purposes, Mr. Bunting reviewed the entries of the PCAP event reports and compared them to their corresponding PCAP network capture data and determined that the data was accurately represented. *Id*.

      After the tests were concluded, Mr. Bunting allowed one test computer to download all four (4) test files so they could be shared and detected by the Detection System again via a VPN, but the Detection System did not connect and provide any downloads to his test computer, but were downloaded from sources within his local network of tests computers. (*Id.*, ¶34, pg. 22).

Therefore, the MaverickEye infringement detection software only downloads files from clients offering files to share and does not share any files in return. (*Id.*, ⁋34, pg. 22).

Next, Mr. Bunting hashed the known test files using both MD5 and SHA1 hashing algorithms and compared the hashes from the Detection System to download to the hashes in the original set and found them to be identical. (*Id.*, ⁋36, pg. 23). The files downloaded by the Detection System from the test computers via the BitTorrent peer-to-peer network were identical copies of the original source files. *Id*.

From his tests, Mr. Bunting has determined that the MaverickEye infringement detection software works and accurately identifies the IP addresses of the responsible devices for sharing files on the BitTorrent network. (*Id.*, ⁋37, pg. 23). Obtaining the IP addressee's information is the logical first step in identifying the correct party." *TCYK, LLC v. Does 1-44*, No. CV 13-3825, 2014 WL 656786, at *4 (N.D. Ill. Feb.20, 2014).

Mr. Bunting also reviewed Mr. Madden's claim of Plaintiff discarding valuable extrinsic data in his red light camera analogy. Mr. Bunting addresses the flaws in Mr. Madden's analogy by pointing out that the data from a red light camera is only as good as the quality of the picture taken of the offending vehicle. Red light cameras have a margin of error and are effected by weather conditions and lighting. PCAP data, by contrast is very precise and is unaffected by the surrounding environment. The detection system makes an exact copy of the data and places that copy into a record. (*Id*. ⁋37, pg. 37).

    C.    The 9th Circuit's *Gonzales* Decision is Inapplicable

Defendant makes the erroneous argument that courts in this District should follow the 9th Circuit decision in *Cobbler Nevada v. Gonzales* which held that it is not sufficient to bring a cause of action of copyright infringement against a registered subscriber of an IP address.

12

*Cobbler Nevada v. Gonzales,* 901 F.3d 1142, 1144 (9th Cir. 2018). This Court is not bound by the decisions of another district court or another Circuit. As a matter of law, there is no obligation on the part of either to know or abide by the holdings or rulings of the other. For example, "Nothing the Eighth Circuit decides is "binding" on district courts outside its territory. Opinions "bind" only within a vertical hierarchy. A district court in Wisconsin must follow our decisions, but it owes no more than respectful consideration to the views of other circuits." *United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994).

In addition, the facts of *Gonzales* are distinguishable from the facts of this case and therefore merit a different outcome. In *Gonzales,* the registered subscriber of the infringing IP address, Thomas Gonzales, operated an adult foster care facility, but did not live there. Plaintiff's original complaint against defendant as an unnamed Doe defendant was dismissed without prejudice. Plaintiff then filed a first amended complaint naming defendant Thomas Gonzales. The court again dismissed the claim against defendant and granted plaintiff three (3) weeks to file a second amended complaint. Plaintiff filed a second amended complaint naming Thomas Gonzales without adding any new factual allegations. The court ordered plaintiff to show cause why it had not cured the alleged deficiencies identified in its first complaint. Shortly thereafter, plaintiff dismissed its case against defendant.

In the present case, no errors have been identified in Plaintiff's complaint nor has Plaintiff amended its complaint to name Defendant. The facts of the 9th Circuit *Gonzales* case are substantially different from the present matter and therefore warrant a different result.

Likewise, the recent recommendation of a magistrate judge in *Strike 3 Holdings, LLC v. John Doe* is inapplicable as being from another District with facts that are dissimilar to the facts of the present case. *Strike 3 Holdings, LLC v. John Doe,* 18-cv-0449 et al. (EDNY 2019). The

magistrate judge denied plaintiff's request for leave to issue early discovery in order to ascertain the names and addresses of the internet subscribers who were illegally downloading plaintiff's adult films. *Strike 3* is not binding on this court, but is only persuasive at best. Moreover, the record does not reflect whether the Court accepted the magistrate judge's recommendation as the case was voluntarily dismissed thereafter.

Considering the hundreds of similar copyright infringement cases throughout the country, the decisions in Gonzales and a few other cases outside the Northern District of Illinois and the Seventh Circuit comprise a minority position.

D. <u>Defendant's Arguments Regarding the Case Filings by Plaintiff are Immaterial</u>

Defendant makes several comments regarding the volume of filings made by Plaintiff and others in copyright infringement lawsuits. Defendant ignores the economic losses due to piracy on the movie industry. BitTorrent infringement is committed on a pandemic scale. In 2011, the Motion Picture Association of America (MPAA) estimated losing $20 billion due to piracy.[1] In an article published October 30, 2017, it was estimated that global online piracy would be worth $52 billion by 2022 and $11.6 billion in the U.S. alone.[2] However, efforts to curb online piracy are having an effect.[3] "In the Internet Age, such suits have served as a teaching tool, making clear that much file sharing, if done without permission, is unlawful[,] and apparently have had a real and significant deterrent effect." *Glacier Films (USA), Inc. v. Turchin*, 896 F.3d 1033, 1041 (9th Cir. 2018) (internal citations omitted).

Defendant further alleges that Plaintiff employs a "cut-and-run" strategy, but Defendant fails to appreciate that most litigation is resolved prior to trial. The filing of legitimate lawsuits

---

[1] See https://www.hastac.org/blogs/wyldmann27/2017/12/11/internet-piracy.
[2] See https://www.ibc.org/delivery/cost-of-online-piracy-to-hit-52bn/2509.article.
[3] https://www.blog.google/outreach-initiatives/public-policy/protecting-what-we-love-about-internet-our-efforts-stop-online-piracy/

in an attempt to resolve a dispute by settlement is not an improper use of the legal process. Plaintiff has identified specific defendants by connecting them to IP addresses that have been involved with torrenting its movies. The fact that a party has not yet taken a claim to trial does not diminish the legitimacy of its motives, particularly when the vast majority of civil lawsuits never make it to trial.[4]

As demonstrated by Mr. Bunting's comprehensive analysis of the Detection System used by Plaintiff, there is nothing "objectively unreasonable" about this case and Plaintiff's position does not constitute "sham litigation" as Defendant so vehemently alleges. "Individual cases … deserve to be judged on their merits and not saddled with a blanket indictment against peer-to-peer copyright litigation." *Glacier Films* at 1038.

### III. <u>CONCLUSION</u>

In sum, Defendant has failed to overcome the heavy burden required to justify reconsideration. The declaration of defense counsel David Madden who is not an expert in peer-to-peer computer networks or related matters fails to establish that this Court erred in any manner. For these reasons and the reasons set forth in this Response, Plaintiff respectfully requests this Court to deny Defendant's Motion for Reconsideration, each side bearing its own fees and costs.

---

[4] See *John Barkai, et al.*, *A Profile of Settlement,* COURT REVIEW: THE JOURNAL OF THE AMERICAN JUDGES ASSOCIATION, Vol. 42, Iss. 3-4 (December 2006) *available at* http://digital commons.unl.edu/cgi/viewcontent.cgi?article=1024&context=ajacourtreview ("[P]erhaps up to 97% of cases are resolved by means other than trial.").

Respectfully submitted,

Dated: May 21, 2019  BODYGUARD PRODUCTIONS, INC.

By: s/Michael A. Hierl
Michael A. Hierl (Bar No. 3128021)
William B. Kalbac (Bar No. 6301771)
Hughes Socol Piers Resnick & Dym, Ltd.
Three First National Plaza
70 W. Madison Street, Suite 4000
Chicago, Illinois 60602
(312) 580-0100 Telephone
(312) 580-1994 Facsimile
mhierl@hsplegal.com

Attorneys for Plaintiff
Bodyguard Productions, Inc.

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a true and correct copy of the foregoing Plaintiff's Response to Defendant's Motion for Reconsideration was filed electronically with the Clerk of the Court and served on all counsel of record and interested parties via the CM/ECF system on May 21, 2019.

s/Michael A. Hierl