1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Honorable Thomas S. Zilly

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON

### AT SEATTLE

STRIKE 3 HOLDINGS, LLC, a Delaware
corporation,

                Plaintiff,

vs.

JOHN DOE subscriber assigned IP address
73.225.38.130,

                Defendant.

Case Number: 2:17-cv-01731-TSZ

**REBUTTAL EXPERT REPORT TO
STRIKE 3 HOLDING'S EXPERT
REPORTS OF PAIGE AND BUNTING
REGARDING RELIABILITY OF THE
IPP INFRINGEMENT MONITORING
SYSTEM**

Rebuttal Expert Report to Strike 3 Expert Reports of Paige and Bunting - Kal Toth 2019April29 (2).docx

# Rebuttal Expert Report to Strike 3 Holding's Expert Reports of Paige and Bunting Regarding Reliability of the IPP Infringement Monitoring System

April 29th, 2019
Prepared by Dr. Kal Toth, P.Eng., Portland, OR 97205
For Mr. J. Curtis Edmondson, Law Offices of J. Curtis Edmondson, Hillsboro, OR 97124

In this report I rebut declarations and reports by the Plaintiff's experts (Paige and Bunting), relating their work to information disclosed by two members of IPP's operational staff. As indicated below I am of the opinion that the experts did not provide convincing facts, data, principles, methods, and reasoning demonstrating that the IPP system operates reliably for its intended purposes, namely to:

> (a) detect and report infringement, and

> (b) support the essential day-to-day procedures of verifying IPP system outputs by operational stafff.

The approach I have therefore taken is to first summarize the pertinent facts and data disclosed by way of the depositions of Stalzer and Pasquale, followed by discussions relating to the expertise and methods used by the Plaintiff's experts to test the operational IPP system.

# Contents

1. My Approach ........................................................................................................................ 1
2. Synopsis of My Qualifications .............................................................................................. 2
3. Evidence Reviewed and Referenced .................................................................................... 2
4. Video Verification, Susan Stalzer ......................................................................................... 2
5. PCAP Verification, John Pasquales ...................................................................................... 3
6. Patrick Paige Background and Expertise .............................................................................. 3
7. Stephen Bunting Background and Expertise ......................................................................... 3
8. Tests Conducted by Paige and Bunting ............................................................................... 4
9. Testing Conducted by Paige and Bunting as it Relates to Stalzer and Pasquale ................ 4
    9.1   Concerns Relating to Stalzer's Declaration and Deposition ............................................ 4
    9.2   Concerns Relating to Pasquale's Declaration and Deposition ........................................ 5

# 1. My Approach

Below I describe operational scenarios highlighting pertinent facts, data and methods experts that Paige and Bunting have failed to address. These informational gaps imply there is a significant risk that IPP delivers an unacceptable number of false positive reports of infringement. By false positives I mean operational scenarios where data reported by the IPP system incorrectly binds an identifying attribute of a user, such as an IP address, with a copyrighted movie of the Plaintiff. More generally, I have defined:

> *false positives are undetected reports of infringement delivered to a plaintiff that could culminate in the issuance of a subpoena that wrongfully discloses the identity of an innocent party.*

Software and systems engineering professionals routinely apply best practices to ensure that the systems, software, and procedures they design and specify are reliable enough to minimize operational risks. To date, the Plaintiff's experts have not provided convincing facts and data showing that such best practices and have

been applied to develop, test, quality assure, and maintain the IPP system. I understand that IPP is touted by some of IPP's experts to be a forensics tool that accurately identifies infringing BitTorrent users. I am of the opinion that IPP if cannot be relied upon to consistently discriminate between infringers and non-infringers, it should not be used for forensics purposes.

Should the Plaintiff's experts provide facts, data and method demonstrating that the system requirements are consistently satisfied by the operational system, I would gladly review and re-assess IPP's reliability (Exhibit 9).

I acknowledge that the false positive rates for complex systems are challenging to assess. I believe the burden of proof is on the owner of a forensics tool, such as IPP, to provide requisite facts, data, and methods that demonstrate that the system is sufficiently reliable to mitigate the risk of false positives being delivered.

## 2. Synopsis of My Qualifications

The opinions expressed in this report are drawn from my professional experience provided in the annex to my *Amended Expert Report: Reliability Assessment of IPP Software, Kal Toth, 04/15/19* (Exhibit 9). My most relevant qualifications include: independent validation and verification of a secure messaging network for Canada's embassies abroad; quality, reliability, maintainability, safety, security, and software engineering for Hughes Aircraft for Canada's air traffic control system; software engineering practice leader for CGI Group and Hughes Aircraft; and software engineering courses for ten universities including Portland State University, Oregon State University, and the Technical University of British Columbia (now part of Simon Fraser University).

## 3. Evidence Reviewed and Referenced

Exhibit 1  Declaration of Susan B. Stalzer in Support of Plaintiff's Motion for Leave to Serve a Third Party Subpoena Prior to Rule 26(f) Conference, Case No.: 2:17-cv-01731-MJP, Document 4-5, filed 11/29/17.

Exhibit 2  Extracted pages from the rough transcript of the deposition of Susan B. Stalzer deposition, 4/16/19, pp. 29, 33, 49, 58, 75, 76,118, 133, 138, 140, 141).

Exhibit 3  Declaration of John S. Pasquale in Support of Plaintiff's Motion for Leave to Serve a Third Party Subpoena Prior to Rule 26(f) Conference, Case No.2:17-cv-01731-MJP, Document 4-4, filed 11/29/17.

Exhibit 4  Extracted pages from the rough transcript of the deposition on John S. Pasquale, 04/17/19, pp25-28, 33-36, 37-38, 42-45, 53-54, 72-74.

Exhibit 5  Declaration of Patrick Paige, S3H (217-cv-01731)_000166, filed 11/12/13.

Exhibit 6  Expert Report Regarding Testing of IPP International UG's Infringement Detection System (Exhibit B), Patrick Paige Computer Forensics LLC, S3H (217-cv-01731)_000171, filed 11/06/18.

Exhibit 7  Declaration of Stephen M. Bunting, S3H (217-cv-01731)_000155, dated 12/11/18.

Exhibit 8  Declaration of Brandon Garcia-Paeth in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment, Case no. 2:17-cv-01731-TSZ, 02/25/219.

Exhibit 9  Amended Expert Report: Reliability Assessment of IPP Software, Kal Toth, 04/15/19.

## 4. Video Verification, Susan Stalzer

Having reviewed declaration Exhibit 1 and deposition Exhibit 2 of Susan Stalzer, I can confirm the following:

a.  Stalzer's declaration Exhibit 1 (paras 7 and 8) state that she was tasked to visually verify each *infringing file* provided to her by IPP to determine if it was identical to, strikingly similar to, or substantially similar to a motion picture (movie) identified as owned by Strike 3 on torrent websites;

b.  Stalzer deposition Exhibit 2 discloses that she uses a *verification tool* to select and display from a list of movie titles on her computer screen, each having a hash mark, each representing a [purportedly] infringing file; and also displaying a copy of a movie owned by Strike 3 (control copy) obtained and

displayed by logging into a torrent website, entering the same movie title into the search window of her browser, and downloading the file;

c. Stalzer in Exhibit 2 discloses that she uses the verification tool to select a file from the list, visually compares the two movies, and indicates whether they visually match ("good") or do not match ("bad") by pressing a button, recording failed matches ("bad") in an Excel spreadsheet. At some later date, she signs a declaration listing movies that she apparently identified as "good". With respect to her comparison task, Stalzer confirms (pp.140-141) that she does "not have a measure with which to grade between the three categories" [identical to, strikingly similar to, or substantially similar];

d. Apparently, Stalzer does not rely on the provided hashes to execute her task, and is not provided the IP address of purported infringer(s) via her verification tool. Her screen does not indicate that the infringed file was received from the IPP system or that the downloaded control copy of the movie is owned by Strike 3. The *verification tool* apparently interfaces with IPP and is not a commercial product;

## 5. PCAP Verification, John Pasquales

I reviewed declaration Exhibit 3 and deposition Exhibit 4 of John Pasquales and can confirm the following:

a. Pasquale's deposition Exhibit 3 (paras 7-10) states that he received a PCAP from IPP related to the IP address of the Defendant; that he used a commercial tool called Wireshark to verify the IP address and the date/time contained in the PCAP; and that he determined from the IP address (associated with the Defendant) that the Internet Service Provider (ISP) was Comcast Cable.

b. Pasquale's deposition Exhibit 4 discloses that he uses a workflow application program called Jira to obtain PCAPs and declarations to/from co-worker (Paul). His verification task involves analyzing the PCAP, determining the associated ISP, recording the ISP, signing the declaration, and returning it using Jira. (pp25-28). The declarations are used to obtain subpoena's for the purpose of obtaining the identity (name, contact info. etc.) of the IP address of the subscriber (e.g. the Defendant) (pp33-36);

c. Pasquale confirmed that PCAP files do not contain any information suggesting they were provided (sent) by the IPP system (they came from "Paul" using Jira (pp37-38)). Pasquale uses a utility program to look up the name of the ISP. He rejects the declaration if the PCAP cannot be verified (pp42-45). He was not able to confirm that he received all the PCAPs related to the IP address of the purportedly infringing IP address recorded in the PCAP (p49) or other PCAPs listed in the complaint for this case (p53-54). He acknowledged that PCAPs contain non-routable IP addresses communicating with the IP address of the Defendant (pp72-74).

## 6. Patrick Paige Background and Expertise

I have reviewed declaration Exhibit 5 and expert report Exhibit 6 of Patrick Page.

Mr. Paige outlines his experience as a police officer, detective in a crimes unit, investigation of child pornography, subpoenas, and search warrants. He discloses some familiarity with using software programs to investigate computers, likely personal computers. His roles appear to be mostly supervisory. He provides little evidence of the level of experience he has with complex software-based systems such as IPP. He provides opinions about WiFi networks, password protection, and hacking in the absence of supportive facts or data. He does not appear to have any experience in systems or software engineering, software design, coding, testing, or quality assurance. His declaration and expert report describes simplistic tests he has setup and applied to the IPP system which I discuss further below.

## 7. Stephen Bunting Background and Expertise

I have reviewed declaration Exhibit 7 of Stephen Bunting.

Mr. Bunting outlines his considerable experience as a police officer, digital, network, and cyber forensics consultant, training, author, fact witness, and investigation of child sexual abuse. He discloses some familiarity using software programs to investigate computers. He does not appear to have any experience in systems or software engineering, software design, coding, testing, or quality assurance. He provides little evidence of the level of experience he has with complex software-based systems such as IPP. He describes some aspects of

the Wyoming Toolkit without providing details about the level of hands-on experience with the tool. He also describes tests he conducted for MaverickEye on a system that is similar to IPP. I comment about the tests he describes below.

## 8. Tests Conducted by Paige and Bunting

Having reviewed declaration Exhibit 5 and expert report Exhibit 6 of Patrick Page, and the declaration of Stephen Bunting, I can confirm the following.

The tests described by Paige and Bunting are trivial tests that set up three or four test computers with installed BitTorrent clients connected to Internet service providers configured to share a small number (e.g. 4) predetermined video files using BitTorrent. These simplistic "demonstration tests" confirm that all the pieces of the videos were detected and captured by IPP. However, the IPP system's operating workload at the time of the tests, and the workload conditions in the BitTorrent swarm were not described. And their tests did not document the operating workloads or churn among peers participating in the BitTorrent swarm during the period of the testing.

Paige and Bunting's tests demonstrate nothing about the reliability of the IPP software when operated under real-world operating conditions. They have not attempted to address the problems associated with routers using dynamic IP addressing (i.e. IP address resets), or conduct tests that attempt to determine if more than one user is attached to the router, or that the user has aborted an unintended download, or that a user has shut down because all the pieces of a movie have been received from other users in the swarm.

At the very least, these tests should have simulated router resets by powering them down and rebooting them during file sharing, and by running scenarios where BitTorrent users abort the downloading of shared video files before completion. Such operationally representative tests would have confirmed whether the IPP software could cope with unusual circumstances and events, and whether all the pieces of a video file could be received by users collaborating across an intensively active BitTorrent swarm.

## 9. Testing Conducted by Paige and Bunting as it Relates to Stalzer and Pasquale

### 9.1 Concerns Relating to Stalzer's Declaration and Deposition

Now relating Stalzer Exhibits 1 and 2 to testing conducted by Paige and Bunting, I can confirm:

a. None of the tests conducted by Paige or Bunting verified that "infringing files" (movies) were reliably transferred from the IPP system to the verification tool to support Stalzer's verification work;

b. Neither Paige nor Bunting conducted tests that the entirety of an "infringing file" associated with the IP address of a purported infringing user was transferred to the verification tool, that is, that an entire movie verified by Stalzer were indeed determined to have been captured from the purported infringer;

c. No tests were performed to verify that the *control copies* retrieved from the torrent website(s) used by Stalzer are actually owned by Strike 3, for example, by checking file hashes;

d. No tests were performed to verify that the "infringing file" and the control copy retrieved from the torrent website are computationally identical – this could be done by calculating and comparing file hashes;

**Facts of the Matter:** In the absence of successfully executed tests a., b., c. and d. above, the Plaintiff's experts (Paige and Bunting) have not demonstrated the following facts:

i. that infringing files were reliably transferred to the verification tool from IPP;

ii. that the entire file received by the verification tool was received from a single infringing user;

iii. that the control copy used by the verification tool was actually owned by Strike 3.

Given these facts, IPP may well have been routinely delivering false positive reports to Stalzer.

**Additional Findings:** Brandon Garcia-Paeth (Exhibit 8) and Kal Toth (Exhibit 9) confirm that in the present case, IPP downloaded at most 2 pieces (0.007%) of each of the purportedly infringed files from the Defendant's IP address. This raises several serious questions:

#1   By way of the verification tool, how could Stalzer have successfully played the "infringed file" delivered by IPP given that IPP reported detecting only a tiny fraction (0.007%) of the file?

#2   Could it be that IPP actually delivers an infringed file collected from many BitTorrent users?

#3   Could it be that IPP actually delivers a playable copy that is not acquired by way of BitTorrent?

These findings additionally undermine assertions by IPP's experts that IPP is a reliable forensics tool.

### 9.2   Concerns Relating to Pasquale's Declaration and Deposition

Now relating Pasquale Exhibits 3 and 4 to testing conducted by Paige and Bunting, I can confirm:

a.   None of the tests conducted by Paige or Bunting verified that the PCAPs and declarations provided to Pasquale were reliably transferred to him from IPP by way of the Jira tool.

b.   Neither Paige nor Bunting's tests verify how many PCAPs have been collected from a purported infringer and delivered to the PCAP verifier.

**Facts of the Matter:** In the absence of successfully executed tests a. and b. above, the Plaintiff's experts (Paige and Bunting) have <u>not demonstrated</u> the following facts:

i.   that PCAP files and declarations are reliably transferred from IPP to Pasquale over Jira for PCAP verification, ISP lookup, signature, and submission back to Paul;

ii.   that all the PCAPs necessary to assemble a complete/playable movie were received, verified (PCAP and ISP), signed, and submitted to IPP (via Jira and Paul).

Given these facts, Pasquale could be routinely receiving faulty PCAP files and declarations.

**Additional Findings:** Brandon Garcia-Paeth (Exhibit 8) and Kal Toth (Exhibit 9) confirm that in the case of the Defendant, IPP downloaded at most 2 pieces (0.007%) of each of the purported 80 to 87 files alleged to have been infringed. This raises the following concern about IPP's business model:

*Stalzer's task attempts to verify that an infringed movie file can be viewed in its entirety, and compared to a control copy, prior to Stalzer signing a declaration that asserts infringement.*

*In stark contrast, Pasquale's task verifies PCAPs collected from purportedly infringing BitTorrent users. The verifier completes, signs, and submits a declaration in preparation for a possible request to issue a subpoena, and action that is launched immediately upon receiving the first PCAP of a movie from IPP.*

These verification efforts of Stalzer and Pasquale appear to be at odds with each other.

My rate is $350.00 per hour.

*K.C.T/1.*

Signed under the Penalty of Perjury,

Kal Toth (Kalman C. Toth), Ph.D., P.Eng.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Exhibit 1

Declaration of Susan B. Stalzer in Support of Plaintiff's
Motion for Leave to Serve a Third Party Subpoena
Prior to Rule 26(f) Conference, Case No.: 2:17-cv-
01731-MJP, Document 4-5, filed 11/29/17.

The Honorable Marsha J. Pechman

1

2

3

4

5

6

7 **UNITED STATES DISTRICT COURT**

8 **WESTERN DISTRICT OF WASHINGTON**

9 **AT SEATTLE**

| | |
|---|---|
| 10 STRIKE 3 HOLDINGS, LLC, a Delaware corporation, | Case No.: 2:17-cv-01731-MJP |
| 11 | **DECLARATION OF SUSAN B. STALZER** |
| Plaintiff, | **IN SUPPORT OF PLAINTIFF'S MOTION** |
| 12 | **FOR LEAVE TO SERVE A THIRD** |
| vs. | **PARTY SUBPOENA PRIOR TO A RULE** |
| 13 | **26(f) CONFERENCE** |
| JOHN DOE subscriber assigned IP address | |
| 14 73.225.38.130, | |
| 15 Defendant. | |
| 16 | |

17

18

19

20 [Remainder of page intentionally left blank]

21

22

23

24

25

26

27 DECLARATION OF SUSAN B. STALZER IN
SUPPORT OF PLAINTIFF'S MOTION – (2:17-
28 cv-01731-MJP)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

1
**EXHIBIT D**

**DECLARATION OF SUSAN B. STALZER IN SUPPORT OF PLAINTIFF'S
MOTION FOR LEAVE TO SERVE A THIRD PARTY SUBPOENA PRIOR TO A
RULE 26(f) CONFERENCE**

I, Susan B. Stalzer, do hereby state and declare as follows:

1.     My name is Susan B. Stalzer.  I am over the age of 18 and am otherwise competent to make this declaration.

2.     This declaration is based on my personal knowledge and, if called upon to do so, I will testify that the facts stated herein are true and accurate.

3.     I work for Strike 3 Holdings, LLC ("Strike 3") and review the content of their motion pictures.

4.     I hold a Bachelor's degree and Master's degree in English from Oakland University.

5.     I have a long history of working in the fine arts, with an emphasis on writing, including having served as an adjunct professor of composition and literature.

6.     I am familiar with Strike 3's plight with online piracy and its determination to protect its copyrights.

7.     I was tasked by Strike 3 with verifying that each infringing file identified as a motion picture owned by Strike 3 on torrent websites was in fact, either identical, strikingly similar or substantially similar to a motion picture in which Strike 3 owns a copyright.

8.     IPP provided me with the infringing motion picture file for each of the file hashes listed on Exhibit A to Strike 3's Complaint.

9.     I viewed each of the unauthorized motion pictures corresponding to the file hashes side by side with Strike 3's motion pictures, as published on the *Blacked, Tushy* and/or *Vixen* websites and enumerated on Exhibit A by their United States Copyright Office identification numbers.

10.     Each digital media file, as identified by the file hash value, is a copy of Strike 3's corresponding motion picture and is identical, strikingly similar or substantially similar to the

2

Stalzer Declaration

FOX ROTHSCHILD LLP
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

**EXHIBIT D**

original work identified by their United States Copyright Office identification numbers on Exhibit A to the Complaint.

### DECLARATION

**PURSUANT TO 28 U.S.C. § 1746,** I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 20th day of November, 2017.

SUSAN B. STALZER

By:

3

Stalzer Declaration

FOX ROTHSCHILD LLP
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

**EXHIBIT D**

Exhibit 2

Extracted pages from the rough transcript of the

deposition of Susan B. Stalzer deposition, 4/16/19,

pp. 29, 33, 49, 58, 75, 76,118, 133, 138, 140, 141

Stalzer041619.txt

1

```
1              THIS IS AN UNCERTIFIED ROUGH DRAFT
2          AND CANNOT BE QUOTED IN ANY PLEADINGS
3           OR USED FOR ANY PURPOSE OTHER THAN
4             CASE PREPARATION AND MAY NOT BE
5                FILED WITH ANY COURT
6
7          This uncertified rough draft has not been
8      proofread and may contain untranslated
9      stenographic symbols, an occasional reporter's
10     note, a misspelled proper name and/or
11     nonsensical word combinations.  All such entries
12     will be corrected on the final certified
13     transcript.
14                      Due to the need to correct
15     entries prior to certification, you agree to use
16     this draft only for the purpose of augmenting
17     counsel's notes and not to use or cite it in any
18     court proceeding.
19                      Please keep in mind that the
20     final certified transcript page and line numbers
21     will not match the rough draft due to the
```

Page 1

Stalzer041619.txt

19    not clear to me.

20         Q.   Okay.  Well, let's walk through it.

21              First day you got this job at --

22    for Strike 3 Holdings, how did you verify the

23    first work?

24         A.   We have a verification tool in which I

25    can play the clips.


                                              23

1         Q.   Okay.  What is the name of that

2    verification tool?

3         A.   Verification tool.

4         Q.   Okay.  Who made the verification tool?

5         A.   I have no idea.

6         Q.   How do you know the verification tool

7    works?

8              MR. BANDLOW:  Objection.  Vague and

9              ambiguous.

10             THE WITNESS:  It works in what regard?

11        I don't understand the question.

                     Page 29

Stalzer041619.txt

22    and you open up the verification system.

23        A.    Correct.

24        Q.    What's the first thing you see when

25    you open up the verification system?

                                                    26

1         A.    A list of hash marks.  A list of the

2    site that the film is purported to be coming

3    from, the title that is believed to be attached

4    to this film and a button where I can hit play

5    for the film to pop up for me to view it.

6         Q.    Okay.  And how is that information

7    organized?

8              MR. BANDLOW:  Objection.  Vague and

9         ambiguous.

10             THE WITNESS:  Often alphabetically by

11        title.

12    BY MR. EDMONDSON:

13        Q.    Okay.  Is it organized by case?

14        A.    No, sir.

                    Page 33

Stalzer041619.txt

3          (Whereupon, the record was

4          read.)

5          THE WITNESS:  It's my understanding

6      that the productions that they put out,

7      they own copyrights on.

8   BY MR. EDMONDSON:

9      Q.   How is that your understanding?

10     A.   Because they are branded as their

11  material.  I guess I'm not sure how to answer

12  that more clearly.

13     Q.   Okay.  So you have seen a number of

14  the Strike 3 Holdings movies?

15     A.   I have.

16     Q.   Okay.  And where on the movies does it

17  say Strike 3 Holdings?

18     A.   Okay.  Fair enough.  I know they're

19  owned by the sites.  The connection between the

20  websites where the movies are put forth for

21  membership in viewing versus Strike 3's

22  relationship with that copyright, I have no

23  knowledge.

24     Q.   Okay.  So you talked about the

25  websites.  Did you ever see the words

Page 49

```
                        Stalzer041619.txt
 2    have enter a user ID and password?

 3         A.    Yes.

 4         Q.    And what is that user ID and password?

 5              MR. BANDLOW:  That's confidential.

 6              MR. EDMONDSON:  We can mark it as

 7         confidential.

 8              THE WITNESS:  It's independent to me.

 9    BY MR. EDMONDSON:

10         Q.    I'm not asking what it's independent

11    to.  I'm asking what your user ID and password

12    is.

13              MR. BANDLOW:  We're not going to give

14         that.  I'll instruct the witness not to

15         answer.  It's her user ID and password.  So

16         we're not going to give that to you.

17              MR. EDMONDSON:  There's nothing

18         privileged about the user ID and password.

19              MR. BANDLOW:  I'm still not going to

20         give that to you based on your history with

21         harassing her, so, no, you're not getting

22         it.  So next question.

23              MR. EDMONDSON:  It's not her property,

24         it's the property of Strike 3 Holdings.

25              MR. BANDLOW:  I understand, but I'm
```

Stalzer041619.txt

7  marked Page 3.  Have you ever described yourself

8  as a comparer?

9       A.   I think it's a fair description.

10      Q.   Okay.  But did you talk to anybody --

11  well, have you ever seen this text here before?

12      A.   I did not.

13      Q.   You did not draft this information

14  here?

15      A.   No, sir.

16      Q.   So you didn't tell someone at Fox

17  Rothschild that you're a comparer?

18      A.   No.

19           MR. BANDLOW:  We came up with that

20      lovely word, Curt.  We're very proud of it.

21  BY MR. EDMONDSON:

22      Q.   And you see here, possesses

23  information that the motion pictures identified

24  by their cryptographic hash value on the

25  BitTorrent network that defendant's IP address

Stalzer041619.txt

59

1    infringed correspond to motion pictures owned by

2    Strike 3.

3                    Now, we just looked at

4    Document 62 there, correct --

5         A.    Correct.

6         Q.    -- the screen of the verification

7    system?

8                    Is there an IP address anywhere on

9    that screen?

10        A.    Not that I have, no.

11        Q.    And do you know of any IP addresses in

12   this case?

13        A.    No.

14        Q.    Do you know of any IP addresses in any

15   case?

16        A.    No.

17        Q.    Do you know your own IP address?

18        A.    Not offhand, no.

19        Q.    Let me hand you a document marked

20   Exhibit 45.  Miss Stalzer, have you seen this

21   document before?

22        A.    No.

23        Q.    Have you ever seen a complaint in any

Stalzer041619.txt

16    Conference?

17        A.    Yes, I see that.

18        Q.    So when -- did you, when you signed

19    this declaration, did you read that caption?

20        A.    I'm not given the cover pages when the

21    declarations are sent to me.

22        Q.    I see.  So you don't know if it's for

23    a particular case, correct?

24        A.    I don't have the case number that's

25    attached.

                                              92

1         Q.    Okay.  How many declarations have you

2    signed?

3         A.    I don't know exactly.

4         Q.    Well --

5         A.    From your own information, it seems to

6    be over 3,000.

7         Q.    Does that seem right?

8         A.    Yes, sir.

                    Page 118

Stalzer041619.txt

4      Q.   From Oakland University?

5      A.   Yes.

6      Q.   Would you say your command of the

7   English language is probably better than the

8   average person's?

9         MR. BANDLOW:  Objection.  Calls for

10     speculation.  Vague and ambiguous.

11          Go ahead and answer.

12     THE WITNESS:  I don't know that

13     I'm arrogant enough to put myself above

14     and beyond other people.  I feel I have

15     a reasonable command of the English

16     language.

17   BY MR. EDMONDSON:

18      Q.   Okay.  Now, the sentence IPP

19   provided me with the infringing motion picture

20   file, did IPP provide you with the infringing

21   motion picture file?

22      A.   Through the verification tool, yes.

23      Q.   But that's not what that says.  It

24   doesn't say IPP provided me with the infringing

25   motion picture file through the verification

Page 133

Stalzer041619.txt

107

1       A.    Again, it would vary depending on the

2    situation.  There have been times more often

3    than direct communication between Tobias and

4    myself, Sud will communicate with me and copy

5    Tobias or communicate with Tobias and copy me,

6    "When is the next batch being uploaded,"

7    something to that effect.

8       Q.    And what's Tobias's e-mail address?

9       A.    I don't know off the top of my head.

10      Q.    But IPP did not provide you with the

11   infringing motion picture, the verification

12   system provides you with that?

13      A.    They have to get there somehow.  They

14   have to get into the verification tool some way,

15   and IPP is the way in which they are loaded into

16   the verification tool.

17      Q.    But there's nothing on the

18   verification tool that says IPP on it, correct?

19      A.    Not to my knowledge.

20      Q.    Okay.  Now, looking at Paragraph 9 of

21   this declaration, do you see reference to

22   Exhibit A?

23      A.    Yes.

Page 138

Stalzer041619.txt

17       for me.

18    BY MR. EDMONDSON:

19       Q.    Now, going back to Exhibit 62 [Sic],

20    and you see Paragraph 10 on your declaration,

21    how do you note whether the motion picture and

22    the digital media file is identically identical

23    or strikingly similar or substantially similar?

24       A.    Through the number of different ways

25    I use to verify, as I had stated earlier.

                                                 109

1        Q.    Yeah, but those are three different

2     categories.  So do you have a notation system of

3     determining which of these works were identical,

4     which were strikingly similar and which were

5     substantially similar?

6        A.    No.

7        Q.    How do you distinguish between those

8     three characteristics?

9        A.    I do not have a measure with which to

                     Page 140

Stalzer041619.txt

10    grade between those three categories.  I guess

11    the only way I know how to answer that question

12    is that before I will verify something is good,

13    that I am confident that they are the same film.

14        Q.    Okay.  But you used three words in

15    this declaration.

16        A.    The declaration states three different

17    ways.

18        Q.    The declaration states three different

19    characteristics, or three different analysis,

20    identical, strikingly similar or substantially

21    similar.

22              What I'm asking is how do you

23    characterize each of those three species?

24        MR. BANDLOW:  Objection.  Asked and

25        answered.

                                                  110

1              Try again.

2              THE WITNESS:  I don't particularly

Page 141

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Exhibit 3

Declaration of John S. Pasquale in Support of Plaintiff's
Motion for Leave to Serve a Third Party Subpoena
Prior to Rule 26(f) Conference, Case No.2:17-cv-
01731-MJP, Document 4-4, filed 11/29/17

The Honorable Marsha J. Pechman

1

2

3

4

5

6

7    **UNITED STATES DISTRICT COURT**

8    **WESTERN DISTRICT OF WASHINGTON**

9    **AT SEATTLE**

10   STRIKE 3 HOLDINGS, LLC, a Delaware          Case No.: 2:17-cv-01731-MJP
     corporation,
11                                               **DECLARATION OF JOHN S. PASQUALE**
                      Plaintiff,                 **IN SUPPORT OF PLAINTIFF'S MOTION**
12                                               **FOR LEAVE TO SERVE A THIRD**
     vs.                                         **PARTY SUBPOENA PRIOR TO A RULE**
13                                               **26(f) CONFERENCE**
     JOHN DOE subscriber assigned IP address
14   73.225.38.130,

15                    Defendant.

16

17

18

19

20               [Remainder of page intentionally left blank]

21

22

23

24

25

26

27   DECLARATION OF JOHN S. PASQUALE IN              **FOX ROTHSCHILD LLP**
     SUPPORT OF PLAINTIFF'S MOTION – (2:17-        1001 Fourth Avenue, Suite 4500
28   cv-01731-MJP)                                       Seattle, WA 98154
                                                         (206) 624-3600

1
**EXHIBIT C**

**DECLARATION OF JOHN S. PASQUALE IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO SERVE A THIRD PARTY SUBPOENA PRIOR TO A RULE 26(f) CONFERENCE**

I, John S. Pasquale, do hereby state and declare as follows:

1. My name is John S. Pasquale. I am over the age of 18 and I am otherwise competent to make this declaration.

2. This declaration is based on my personal knowledge and, if called upon to do so, I will testify that the facts stated herein are true and accurate.

3. I am a Senior Project Manager with 7 River Systems, LLC a Maryland based cyber security firm specializing in network security, data breaches, and the protection of secured information transmitted across networks.

4. For over 30 years, I have worked in the IT industry, specializing in system and network administration and project management.

5. I have consulted and advised major financial institutions and Fortune 500 companies on the management, security and implementation of major data centers, delivering complex and large scale network projects.

6. I was retained by Strike 3 Holdings, LLC ("Strike 3") to individually analyze and retain forensic evidence captured by IPP International U.G. ("IPP").

7. I received a PCAP from IPP containing information relating to the transaction occurring on 09/05/2017 10:40:33 involving IP address 73.225.38.130.

8. I used a program called Wireshark to view the contents of the PCAP.

9. I was able to confirm that IPP recorded the transaction with 73.225.38.130 at 09/05/2017 10:40:33.

10. Based on my experience in similar cases, Defendant's ISP Comcast Cable is the only entity that can correlate the IP address to its subscriber and identify Defendant as the person assigned the IP address 73.225.38.130 during the time of the alleged infringement. Indeed, a subpoena to an ISP is consistently used by civil plaintiffs and law enforcement to identify a subscriber of an IP address.

1

## DECLARATION

**PURSUANT TO 28 U.S.C. § 1746**, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 24th day of November, 2017.

**JOHN S. PASQUALE**

By:

2

# Exhibit 4

Extracted pages from the rough transcript of the deposition on John S. Pasquale, 04/17/19, pp. 25-28, 33-36, 37-38, 42-45, 53-54, 72-74

This transcript has not been proofread        1

1    (INSERT CAPTION/APPEARANCES/INDEX/SWORN)

2    STARTTIME9:40AM 4/17/19

3    (EXHIBIT MARKED/70)

4           Q       Good morning, Mr. Pasquale.

5           A       Good morning.

6           Q       Could you please state and spell

7    your name for the record?

8           A       John Pasquale, J-o-h-n,

9    P-a-s-q-u-a-l-e.

10          Q       Do you have a middle name?

11          A       Yes, Santo, S-a-n-t-o.

12          Q       Excellent.  Mr. Pasquale, have you

13   ever been deposed before?

14          A       No, I have not.

15          Q       Some of the grounds rules for a

16   deposition is the Court Reporter is taking down

17   our words, so if you can answer verbally, that

18   would be appreciated.  She can't record gestures.

19          A       Understood.

20          Q       If you nod yes or shake no, she

21   can't take that down.

22          A       Understood.

23          Q       Do everything verbally.  The other

24   thing, too, is that I might ask you to either to

25   estimate some things, so what I'd like to you do

This transcript has not been proofread 25

1    Q    Do you know the IP address for your
2 router?
3    A    No.
4    Q    Do you ever analyze any of these
5 PCAPs on a laptop?
6    A    No.
7    Q    So you keep everything on your
8 computer?
9    A    Yes.
10    Q    While you're doing this PCAP
11 analysis, are you making any notes of your
12 analysis?
13    A    No.
14    Q    When you're done analyzing the
15 PCAP, what do you do with it?
16    A    I upload it to a program called
17 JIRA, which is a workflow application and send
18 them off to Paul for review.
19    Q    JIRA?
20    A    J-I-R-A.
21    Q    The PCAP comes in from -- is it
22 Paul?
23    A    Yes.
24    Q    Is that attached to an email?
25    A    No, it's through JIRA.

This transcript has not been proofread 26

1          Q       So you have a JIRA application.

2   Who is on the JIRA application?

3          A       I'm not sure I understand the

4   question.

5          Q       Explain JIRA to me.

6          A       So JIRA is a workflow application.

7   In this case PCAPs and declarations are attached

8   to a particular case.  Then from there I pull up

9   those two documents and analyze, sign and save.

10         Q       You get the declaration and the

11  PCAP.  Are they both together in the same --

12         A       They're together in the same case,

13  yes.

14         Q       Just so the record is clear, when

15  we use the word "case," in the legal profession

16  we're usually referring to something like a

17  lawsuit.  When you're using the word "case," what

18  do you mean?

19         A       When I'm using the word "case," it

20  is one declaration and one PCAP.

21         Q       In the JIRA?

22         A       Yes.

23         Q       Is there any notation that says

24  this is for a lawsuit number, and in this case

25  2:17-cv-01731?

This transcript has not been proofread 27

1      A      There are numbers attached to it.

I'm not sure if they coincide with a lawsuit.

3      Q      When is the last time you looked at

the JIRA app?

5      A      Three days ago.

6      Q      Describe what you saw in that last

transaction?

8      A      So the case, what I'm calling the

case would have a number associated with it, an

abbreviation of a district, what state that it's

in, and then the actual district within the state,

and I believe that's it.

13     Q      Is the number a four-digit number?

14     A      Yes.  I believe so, yes.

15     Q      Then when you get it in on JIRA, do

you save the PCAP to your desktop?

17     A      Yes.

18     Q      Do you save the declaration to the

desktop?

20     A      Yes, on a temporary basis.  I don't

save the PCAP.  I save the declaration.

22     Q      You put the declaration on your

desktop?

24     A      I save it locally, and then I

upload it, and then once I'm done, I delete it

This transcript has not been proofread 28

1   from my desktop.

2        Q      Were you ever given instructions by

3   Paul not to delete data?

4        A      No.

5        Q      Were you ever given instructions by

6   Paul to organize the data that you analyze on your

7   system in some directories or folders by the

8   four-digit case number?

9        A      In my system, no.

10       Q      So Paul never said to you to keep a

11  record of the analysis that you have done in these

12  cases.  Is that correct?

13       A      No.  The records are stored on

14  JIRA.  That's what JIRA is for.

15       Q      I understand, but my question was,

16  did he ask you to keep a local independent record

17  of the analysis that you did?

18       A      No.

19       Q      So as we speak right now, the only

20  record that you have of your analysis would be the

21  transactions and JIRA?

22       A      Correct.

23       Q      And obviously the declarations

24  filed in the courts.  Correct?

25       A      Say that again.

This transcript has not been proofread [33]

1    Holdings, LLC produced on the internet, via the

2    internet?

3            A       Before I signed any declaration, it

4    was explained to me by Paul exactly what Strike 3

5    is.  In fact, he consulted with me on whether or

6    not to take on the client, and that was our

7    conversation about Strike 3 and what they do.

8            Q       Did Paul tell you not to do any

9    independent research into Strike 3 Holdings?

10           A       No.

11           Q       So you didn't have the natural

12   curiosity to go out and google "Strike 3

13   Holdings"?

14           A       I'm a very busy man.

15           Q       But you've signed hundreds of

16   declarations for Strike 3 Holdings.  True?

17           A       Yes.

18           Q       Let's go to the next line.  Do you

19   see line 26 there?  Do you see that phrase,

20   "Indeed, a subpoena to an ISP is consistently used

21   by civil plaintiffs and law enforcement to

22   identify a subscriber of an IP address."

23           What is your experience with subpoenas?

24           A       None.

25           Q       Why did you use that word in there?

This transcript has not been proofread <sup>34</sup>

1        A        Well, to me a subpoena is a

2   document through the courts to go to an ISP and

3   obtain an IP address and who that IP address

4   belongs to.

5        Q        The statement is, "Indeed, a

6   subpoena to an I SP is consistently used by civil

7   plaintiffs and law enforcement to identify a

8   subscriber of an IP address."

9        What experience do you have that supports

10  that statement that you made there?

11       A        I know that you would need some

12  type of court order to obtain an IP address.

13       Q        How do you know that?

14       A        Through my experience in the IT

15  industry.

16       Q        What experience has that been?

17       A        It's 35 years of experience.

18       Q        Have you ever worked for an

19  attorney on a subpoena to an ISP?

20       A        No, I have not.

21       Q        Have you ever actually drafted a

22  subpoena going to an ISP?

23       A        No, I have not.

24       Q        What engagements did you ever deal

25  with subpoenas going to ISP's?

This transcript has not been proofread  35

1          A       None.

2          Q       So I want to -- when you say the

3    word there "indeed, a subpoena," that suggests to

4    me a very clear affirmative statement that you've

5    done this a lot, but my understanding is you've

6    never participated in sending subpoenas to an ISP.

7    Is that correct?

8          A       I have not.  You're probably

9    misinterpreting that line.

10         Q       I want to know why you wrote it.

11         A       I wrote it because it's my

12   understanding that a subpoena is needed to go to a

13   -- a court order is needed in order to get an

14   actual person attached to an IP address, through

15   the ISP.

16         Q       Did you draft this sentence?  Did

17   you sit down at a computer --

18         A       No, I did not.

19         Q       Who drafted this sentence?

20         A       This was given to me by 7 Rivers.

21         Q       Do you know if Paul drafted this

22   sentence?

23         A       I don't know.

24         Q       I want you to turn to the next page

25   please.  Do you see the declaration there at the

This transcript has not been proofread 36

1    top?

2         A     Yes.

3         Q     And do you see there, "Pursuant to

4    28 U.S.C. 1746"?

5         A     Uh-huh.

6         Q     What's your understanding of the

7    next sentence, "I hereby declare under penalty of

8    perjury under the laws of the United States of

9    America that the foregoing is true and correct"?

10        A     That anything that I'm saying here

11    -- that anything that is said in this document

12    that I'm signing, that it's true and correct.

13        Q     How do you know this is true and

14    correct?

15        A     I know it's true and correct by the

16    PCAP that I reference.

17        Q     I mean, going back to Line 26 and

18    27.  From experience?

19        A     From experience.

20        Q     But you didn't draft that

21    statement?

22        A     No, I did not.

23        Q     And you testified earlier that

24    you've never had experience sending subpoenas to

25    ISPs?

This transcript has not been proofread 37

1          A       That's correct.

2          Q       You testified earlier -- and I want

3    to make sure.  In Paragraph 7 of your declaration

4    you said, "I received a PCAP from IPP," but I

5    understood you received a PCAP from Paul on JIRA.

6          A       Correct.

7          Q       So why doesn't that sentence say,

8    "I received a PCAP from Paul on JIRA containing

9    information relating to the transaction"?

10         A       I would assume that 7 Rivers

11   Systems is the handler, but the original document

12   comes from IPP.

13         Q       That's an assumption.  Correct?

14         A       Yeah, I guess so.

15         Q       So Paragraph 7 did you -- you

16   didn't draft Paragraph 7?

17         A       As I said, I didn't draft this

18   document.  I reviewed the document.  I look at the

19   content of the document.  I ensure that the

20   content in the document is correct according to

21   the PCAP, and then from there sign it.

22         Q       What I'm trying to do is find out

23   if there's any inaccuracies in this document so,

24   in Paragraph 7 you didn't receive a PCAP from IPP.

25   You received the PCAP from Paul using the JIRA

This transcript has not been proofread 38

1    system.  Correct?

2         A      Sure, you can say that, but the

3    document originates from IPP and Strike 3

4    Holdings.

5         Q      How do you know that?

6         A      Because Strike 3 Holdings is the

7    client of 7 Rivers Systems.

8         Q      Do you do computer forensics?

9         A      Actually, that's what this is.

10        Q      And so you're familiar with

11   concepts of chain of custody?

12        A      Sure.

13        Q      Did you verify the chain of custody

14   of this data coming from IPP to 7 Rivers Systems

15   to your JIRA and then to your desktop?  Did you

16   verify every step?

17        A      No, I did not.

18   (EXHIBIT MARKED/73)

19        Q      I'm going to hand you a blank sheet

20   marked 73.  Can you sketch out the system

21   architecture of the IPP monitoring system to the

22   best of your knowledge?

23        A      I cannot.

24        Q      Can you describe then for me in

25   your best understanding what the IPP system does?

This transcript has not been proofread    42

1          A        No.

2          Q        Do you know where it's located?

3          A        I believe they're in Germany, but

4    I'm not a hundred percent sure.

5          Q        Did you ever ask to visit the IPP

6    facility?

7          A        No.

8          Q        Did you ever ask to speak to

9    anybody at IPP?

10         A        No.

11         Q        Why not?

12         A        It's not part of my job

13   description.   It's above my pay grade.

14         Q        Do you know that these declarations

15   have been used in lawsuits?

16         A        Yes.

17         Q        Have you ever been sued?

18         A        No.

19         Q        What data inside the PCAP would

20   suggest to you that it came from IPP?

21         A        What data?

22         Q        Right.

23         A        None.

24         Q        There's nothing in the PCAP that it

25   came from IPP?

This transcript has not been proofread [43]

1          A        I don't believe so.

2          Q        In your analysis -- going to

3    Paragraph 10, do see Line 23 there on the

4    declaration we've marked as Exhibit 71?

5          A        Uh-huh.

6          Q        "Based on high experience in

7    similar cases."

8                    What other similar cases were you

9    referring to when you said that?

10         A        Other cases that have PCAPs and use

11   Comcast as the ISP.

12         Q        Well, defendant's ISP, Comcast

13   Cable, how did you know it was Comcast?

14         A        There's a program that you can run

15   the IP address, and it will tell you exactly who

16   the ISP is.

17         Q        Did you run that program?

18         A        Yes, I did.  For this one I believe

19   I did, yes.

20         Q        What's the program?

21         A        I don't have it off the top of my

22   head, but I can certainly send it to you if you

23   like.  You can look it up and google it, and

24   probably 4,000 will come up.

25         Q        When you did this analysis you

This transcript has not been proofread 44

1  looked at JIRA.  Right?  You got the PCAP and the

2  declaration from JIRA?

3          A       Correct.

4          Q       And you also took and copied -- and

5  correct me if I'm wrong.  You copied the IP

6  address into this other program to look up who the

7  cable provider is.  Correct?

8          A       Who the ISP is.

9          Q       And then what did you do?  A screen

10  print of that?

11          A       No.

12          Q       How did you confirm that that was

13  Comcast?

14          A       I confirmed what was in the

15  documents stating that the defendant's ISP was

16  Comcast because it was already written there.  As

17  I said, I did not draft these documents.  I'm

18  verifying the documents.

19          Q       You verified it using a program,

20  but you didn't keep a record of your verification?

21          A       No, I did not.

22          Q       Did you have like a?

23          A       This is the record of my

24  verification.

25          Q       Did you have a notebook or

This transcript has not been proofread    45

1    spreadsheet that would say --

2         A       No.

3         Q       What happened if you got -- if it

4    didn't verify?  What would you do?

5         A       I would reject the declaration.

6         Q       How many of these declarations have

7    you rejected?

8         A       At first there was quite a few.  I

9    can't give you an exact amount, but at first I

10   would say ten percent, maybe more.  I don't know.

11   I don't recall.

12        Q       Did you make notes in JIRA --

13        A       Yes.

14        Q       -- on those rejections?

15        A       Yes, I did.

16        Q       So when you saw rejections, did you

17   ask Paul -- is that your son?

18        A       Uh-huh.

19        Q       Did you ask Paul, Why are we

20   getting these rejections?

21        A       Only if it was at a high rate, and

22   there was one point where there was a high rate,

23   but it wasn't due to the wrong ISP.  It was more

24   toward the time stamp itself.

25   (EXHIBIT MARKED/45)

This transcript has not been proofread 53

1          A       I would surmise that it would be

2     Paul if he did.

3          Q       It's a small company.

4          A       Yes.

5          Q       It's a family-run company.

6          A       I don't know if it's family run,

7     but it's run by my son.

8          Q       Before I became a lawyer, I was in

9     the software business with my dad, so I'm familiar

10    with the setup.

11         Now that you know that 80 works were

12    alleged to have been infringed --

13         A       I know that because you just told

14    me, but go ahead.

15         Q       This is a Complaint filed by your

16    customer, strike 3 Holdings, something your

17    customer drafted, not me.  Now that you know that

18    80 works were alleged to have been infringed and

19    now that you've established your professional and

20    cyber investigations --

21         A       You can label it that.

22         Q       If I labeled it incorrectly, please

23    let me know.

24         A       That's fine.

25         Q       Would you have requested PCAPs on

This transcript has not been proofread [54]

1    these other 79 works?

2         A    If I would have known that they

3    were all interconnected?  I don't know to be

4    honest.  I would just be -- I would ask for

5    counsel's guidance.

6         Q    Would you consider your

7    investigation to be thorough if you only looked at

8    one out of 80 PCAPs?

9         A    Yes.

10        Q    Let's explore that.  Do you see

11   under the UTC column where it says 9/5/2017?

12        A    Yes.

13        Q    And you testified earlier and you

14   filed a declaration saying you know something

15   about Comcast Cable.  Correct?

16        A    Uh-huh.

17        Q    And do you know if this IP address

18   supplied by Comcast Cable was static or dynamic?

19        A    Don't know.

20        Q    Do you understand the difference

21   between a static and dynamic IP address?

22        A    Yes.

23        Q    Explain to me the different between

24   a static and a dynamic IP address.

25        A    A static IP address is one that's

This transcript has not been proofread 72

1          A       No, I did not.

2          Q       You didn't look up the source IP

3    address?

4          A       No.

5          Q       Is there anything about that source

6    IP address that is unusual?

7                  MR. ATKIN:  Objection to form.  You

8    can answer if you understand.

9          A       No.

10         Q       You're familiar with the internet

11   topology?

12         A       Yes.

13         Q       Are you familiar with nonroutable

14   IP addresses?

15         A       Nonroutable IP addresses?  To a

16   certain extent.

17         Q       I probably slurred my words.

18   Nonroutable IP address?

19         A       Okay.

20         Q       When you studied internet topology,

21   were you aware of blocks of IP addresses that are

22   designated as not allocated to a particular

23   computer?

24         A       I'm not sure I understand your

25   question.

This transcript has not been proofread 73

1          Q       You understand in the network

2     architecture of the internet that every computer

3     is assigned an IP address?

4          A       Correct.

5          Q       And since there's billions of

6     computers, there's not enough IP addresses to go

7     around.  Correct?

8          A       Yes.

9          Q       And so the way the internet has

10    been organized is that behind routers they will

11    have internal IP?

12         A       Nonregistered IP addresses.

13         Q       And then for everybody to

14    communicate across the internet, you have actual

15    IP addresses?

16         A       Correct.

17         Q       And there's blocks of IP addresses

18    that have been designated that won't route to the

19    outside internet?

20         A       Correct.

21         Q       Otherwise everything would be blow

22    up?

23         A       It would be mayhem, yes.

24         Q       Do you know what those blocks of

25    nonroutable IP addresses are?

This transcript has not been proofread 74

1          A      No.

2          Q      If that IP address turns out to be

3    nonroutable, would it have changed your analysis

4    and your declaration?

5               MR. ATKIN:  Objection.  What is

6    that IP address?

7          Q      Let's put it on the record now that

8    you brought that up.  Can you read off the IP

9    address of Line 2 there?

10              MR. EDMONDSON:  If you can confirm

11   it counsel because I'm not looking it?

12         A      192.168.0.13.

13              MR. ATKIN:  He asked for Line 2.

14              THE WITNESS:  This is Line 2,

15   destination.

16         Q      In this transactions, there's two

17   IP addresses.  Correct?

18         A      Uh-huh.

19         Q      Because we have this computer

20   communicating with --

21         A      Yes.

22         Q      So in this transaction we don't see

23   three or four IP addresses.  It's just --

24         A      Per transaction within the PCAP.

25              MR. EDMONDSON:  Off the record

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Exhibit 5

Declaration of Patrick Paige, S3H (217-cv-01731)_000166, filed 11/12/13

## DECLARATION OF PATRICK PAIGE

**I, PATRICK PAIGE, DO HEREBY DECLARE:**

1.  I am over the age of eighteen (18) and otherwise competent to make this declaration. The facts stated in this declaration are based upon my personal knowledge.

2.  I was a police officer from 1989 until 2011 for the Palm Beach County Sherriff's Department. And, from 2000-2011, I was a detective in the computer crimes unit.

3.  As a detective in the computer crimes unit, I investigated internet child pornography and computer crime cases.

4.  I have conducted forensic computer examinations for:

    (a)   Broward County Sheriff's Office (BSO);

    (b)   Federal Bureau of Investigation (FBI);

    (c)   U.S. Customs and Border Protection (CBP);

    (d)   Florida Department of Law Enforcement (FDLE);

    (e)   U.S. Secret Service;

    (f)   Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); and

    (g)   Various municipalities in the jurisdiction of Palm Beach County.

5.  I was also previously assigned to a police unit working in conjunction with TLO Corp., which is a private company.

6.  When I worked with TLO Corp., I supervised the other detectives assigned to the unit, which was consisted of six online investigators and two computer forensic examiners.

7.  I am familiar with software programs used to investigate computers, including EnCase and Access Data.

1

8.      I have taken over 400 hours of courses designed to teach people how to investigate computers.

9.      Also, while working from 2003-2011 for Guidance Software, the makers of EnCase, I have taught over 375 hours of courses in computer forensics ranging from beginner to advanced levels.

10.     I have had students in my courses from various government branches, including: (a) sheriff's offices; (b) FBI agents; (c) ATF agents; (d) agents from the Central Intelligence Agency, and (e) individuals from other branches of government and the private sector.

11.     After leaving the Palm Beach County Sherriff's office, I founded Computer Forensics, LLC, where I am currently employed.

12.     I have received the following awards and commendations:

(a)     1991 – Deputy of the Year, awarded by the 100 Men's Club of Boca Raton & Rotary Club.

(b)     1997 – Deputy of the Month for June.

(c)     2001 – Detective of the Month for October.

(d)     2002 – Outstanding Law Enforcement Officer of the Year, awarded by the United States Justice Department for work in the *U.S. vs. Jerrold Levy* case.

(e)     2003 – U.S. Customs Service Unit Commendation Citation Award for computer forensic work in Operation Hamlet. Operation Hamlet was one of the largest rings in the history of U.S. Customs of individuals who were molesting their own children, and transmitting the images and video via the Internet.

(f)     2005 – Detective of the Month for December.

(g)     2007 – Outstanding Law Enforcement Officer of the Year, awarded by the United States Justice Department for work in the *U.S. vs. Jimmy Oliver* case.

(h)     2008 – Letter of Commendation issued by the FBI for outstanding computer forensic work in the *U.S. vs. Frank Grasso* case.

2

13.     I have been called to testify as a fact and expert witness on numerous occasions in the field of computer forensics in both trial-level and appellate proceedings before state, federal, and military courts in Florida, California, New Jersey, and New York.

14.     No court has ever refused to accept my testimony on the basis that I was not an expert in computer forensics. My skill set and my reputation are my most important assets in my current position with Computer Forensics, LLC.

15.     With regard to my experience investigating child pornography cases, I supervised police officers whose responsibility it was to establish a successful TCP/IP connection with persons who were sending pornographic images of children or other illegal content over the Internet.

16.     The offenders' IP addresses, as well as the dates and times of the illegal transmission were recorded.

17.     An officer would then request that the assistant state attorney subpoena the corresponding ISPs for the purpose of identifying the subscribers that were transmitting the illegal content.

18.     In these cases, the subscribers were not notified by the ISPs that their identity was being subpoenaed because they could have deleted the images and destroyed the data.

19.     After receiving the subscribers' identities, we would prepare a search warrant that would authorize us to enter the subscribers' dwelling and seize all of their computer devices.

20.     I was directly involved in approximately 200 search warrants either by way of managing the process or performing it personally.

3

21.     I can recall only one instance in all the times that we executed a search warrant and seized computers where we did not find the illegal content at the dwelling identified in the search warrant.

22.     In that one instance, the Wi-Fi connection was not password protected, and the offender was a neighbor behind the residence.

23.     I never came across a Wi-Fi hacker situation.

24.     In my opinion, a child pornographer has a greater incentive to hack someone's Wi-Fi connection than a BitTorrent user because transmission of child pornography is a very serious crime with heavy criminal penalties, and many offenders can face life sentences if convicted.

25.     I tested IPP International U.G.'s ("IPP") IP detection process.

26.     To do so, I downloaded four public domain movies from the national archive.

27.     I then encoded text into the videos, so that I would know whether someone that downloaded that particular movie downloaded the version of the movie that I created.

28.     I then rented four virtual servers, each of which was connected to the Internet and used a unique IP addresses.

29.     I then configured the servers so that all of them were running Windows 2008 server edition, and I put a different BitTorrent client onto each server.

30.     A BitTorrent "client" is software that enables the BitTorrent protocol to work.

31.     After installing the BitTorrent clients, I also installed Wireshark onto each server. "Wireshark" is a program that captures network traffic and creates PCAPs, just as TCP Dump, which IPP uses, does.  A PCAP is like a video recording of all the incoming and outgoing transactions of a computer.

S3H (217-cv-01731)_000169

32.     After installing Wireshark onto each of the servers, I transferred the movies from my local computer to the servers.

33.     I then used the BitTorrent clients on each of the servers to make .torrent files. I uploaded these .torrent files onto various torrent websites.

34.     I then informed IPP of the movie names. Thereafter, IPP sent me screen captures of the movies I had seeded.

35.     The screen captures sent by IPP had my codes on them; thus, I knew that IPP had caught the movies I had seeded.

36.     IPP also sent me additional data identifying the IP Address used by each of the four servers, and sent me PCAPs.

37.     I reviewed IPP's PCAPs vis-à-vis the PCAP log files created by each of my test servers, and determined that IPP's PCAPs match my PCAPs. This could not have happened unless IPP's server was connected to the test server because the transactions would not match.

38.     From this test, I concluded that IPP's software worked, and had a subpoena been issued for my IP addresses, it would have revealed my identity.

**FURTHER DECLARANT SAYETH NAUGHT.**

**DECLARATION**

**PURSUANT TO 28 U.S.C. § 1746**, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on this 11th day of November, 2013.

By: Patrick Paige

Digitally signed by Patrick Paige
DN: cn=Patrick Paige, o=Computer Forensics LLC,
ou, email=patrick@patrickpaige.com, c=US
Date: 2013.11.11 15:53:41 -05'00'

**PATRICK PAIGE**

5

S3H (217-cv-01731)_000170